**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0683-19

IN THE MATTER OF THE
CIVIL COMMITMENT
OF M.H., SVP-354-04.

_____

Submitted December 15, 2020 – Decided February 19, 2021

Before Judges Moynihan and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. SVP-354-04.

Joseph E. Krakora, Public Defender, attorney for appellant (Patrick Madden, Assistant Deputy Public Defender, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Stephen Slocum, Deputy Attorney General, on the brief).

PER CURIAM

M.E.H. appeals from an order, entered after a review hearing at which the judge heard testimony from three expert witnesses, continuing his involuntary civil commitment to the Special Treatment Unit (STU), pursuant to the New

Jersey Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. We disagree with M.E.H.'s argument that the judge "erred in crediting the State with having . . . met the criteria for commitment as a [s]exually [v]iolent [p]redator" by proving that a "combination" of evidence regarding M.E.H.'s "diagnosis and risk assessment, as well as its perspective [of] the facts" established that he was "highly likely to commit a sexually violent offense in the foreseeable future," and affirm.

Judges are authorized to continue an involuntary commitment under the SVPA if the State proves by clear and convincing evidence, N.J.S.A. 30:4-27.32(a):

> (1) that the individual has been convicted of a sexually violent offense; (2) that he [or she] suffers from a mental abnormality or personality disorder; and (3) that as a result of his [or her] psychiatric abnormality or disorder, "it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend."
>
> [In re Civil Commitment of R.F., 217 N.J. 152, 173 (2014) (quoting In re Commitment of W.Z., 173 N.J. 109, 130 (2002)).]

See also N.J.S.A. 30:4-27.26. The State has the burden of proving the committee poses "a threat to the health and safety of others because of the likelihood of his or her engaging in sexually violent acts." W.Z., 173 N.J. at 132. "[T]he State

A-0683-19

must prove that threat by demonstrating that the individual has serious difficulty in controlling sexually harmful behavior such that it is highly likely that he or she will not control his or her sexually violent behavior and will reoffend." Ibid.

As the judge observed in her oral decision, M.E.H. did not contest that the State satisfied the first prong of the SVPA requirements under N.J.S.A. 30:4-27.26. Evidence of M.E.H.'s convictions for sexually violent crimes was documented in our prior opinions on appeal from orders initially committing him in 2004, In re Civil Commitment of M.E.H., No. A-5923-05 (App. Div. Feb. 27, 2008), and continuing his commitment, In re Civil Commitment of M.E.H., No. A-5871-10 (App. Div. Feb. 11, 2014); In re Civil Commitment of M.E.H., No. A-2371-15 (App. Div. June 28, 2018).

In 1997, M.E.H. pleaded guilty to second-degree sexual assault for twice sodomizing a woman to whom he offered a ride after her vehicle became disabled. M.E.H., slip op. at 2 (App. Div. June 28, 2018). In 1990, facing allegations that he restrained and vaginally penetrated his former fiancée, he pleaded guilty to fourth-degree criminal sexual contact admitting that he

A-0683-19

forcibly touched the victim's breasts, vagina and buttocks. <u>M.E.H.</u>, slip op. at 2 (App. Div. Feb. 27, 2008).[1]

The judge also noted in her oral decision that M.E.H.'s diagnosis offered by Dr. Christopher P. Lorah, M.E.H.'s expert in psychology, was conceded by M.E.H.'s counsel to satisfy the second prong under N.J.S.A. 30:4-27.26; and those offered by Roger Harris, M.D. and Dr. Jamie R. Canataro, the State's expert witnesses in psychiatry and psychology, respectively, although conflicting with that of Dr. Lorah, met that prong.

Thus, as the judge determined, the only disputed issue related to the third prong. The SVPA defines "mental abnormality" as "a mental condition that affects a person's emotional, cognitive or volitional capacity in a manner that predisposes that person to commit acts of sexual violence." N.J.S.A. 30:4-27.26.

---

[1] We also previously delineated the sexual offenses with which M.E.H. was charged but not convicted. First-degree aggravated sexual assault charges of a victim he claimed was a prostitute were dismissed as part of the 1997 plea agreement. Following his arrest in 1985 for two counts of rape of a child, and five counts of indecent assault and battery on a child where the victims were a nine-year-old and a twelve-year-old, all charges involving both children were dismissed although he admitted to police that when he penetrated the twelve-year old, the child screamed. He was also arrested for a 1982 attempted sexual assault; he pleaded guilty to a downgraded charge of simple assault. <u>M.E.H.</u>, slip op. at 4-5 (App. Div. Feb. 27, 2008).

A committee's proven impaired ability to control sexually dangerous behavior will suffice to prove a mental abnormality.  See W.Z., 173 N.J. at 129.

M.E.H. argues the judge "failed to give proper weight to [his] lack of problematic behavior" and his recent efforts in treatment, accepting "treatment modules that were offered to him."  The judge, however, credited the opinions expressed by Drs. Harris and Canataro that, although he was capable of understanding and applying treatment concepts, M.E.H. did not progress in his treatment.  The judge chose to reject M.E.H.'s contention that he was capable of self-regulating his behavior.  The judge found the evidence belied that assertion.

She credited Dr. Harris's testimony that M.E.H.'s "difficulties in group" therapy were not personality conflicts but stemmed from his "impulsivity; poor problem solving" and poor self-regulation that results in his externalization of blame.  She, likewise, accepted Dr. Canataro's testimony that M.E.H's difficulties in group therapy—exhibiting "callousness and angry outbursts"—came "back to core treatment issues of the . . . interpersonal conflicts that he has with others and attachment issues."  From Dr. Harris's report the judge also found that M.E.H.'s behavior during his examination—failing to wait for a question to be finished, misinterpreting the question and becoming, at times,

A-0683-19

"condescending and contemptuous"—also evidenced his inability to self-regulate.

Dr. Canataro's testimony that M.E.H.'s risk level was impacted by "his inability to manage his intense emotional expressions as seen in his offending behaviors . . . [that] seep[] out in his daily interactions" at the STU supported the judge's conclusion that M.E.H.'s inability "to manage his intense emotional expressions is a treatment issue for him." The judge agreed with Dr. Canataro that M.E.H. had not had enough treatment to adequately address his impulses, and that "there [was] no mitigation of risk at [that] point." The judge found M.E.H.'s desire to focus on relapse prevention, choosing to discount Dr. Canataro's attempt to equally focus on interpersonal relationships, evidenced that he "wants to do what he wants to do regardless of what the experts, as in the treatment team, advise." And the judge agreed with Dr. Harris's opinion that M.E.H. "would have a hard time negotiating the level of being held accountable for his actions" without "ongoing treatment . . . to understand and better regulate himself at this point." Finding that Dr. Harris had "a thorough understanding of M.[E.]H." and that the doctor's "thought[-]out opinions were believable," the judge accepted Dr. Harris's opinion "that M.[E.]H. ha[d] not sufficiently progresse[d] in treatment to . . . acquire the skills the STU is offering so that he

6

can better manage his sexual drive; better manage his interpersonal functioning; . . . better manage his problem solving; . . . better manage his overall self-regulation."

The judge's finding of M.E.H.'s inability to self-regulate is buttressed by his admission that, despite a prohibition on viewing pornography at the STU, he was "watching porn twice a month," "taking risks in order to satisfy his sexual urges." The judge also found Dr. Lorah's credibility was "lost" because he did not address this issue.

M.E.H. also asserts the judge "improperly dismissed Dr. Lorah's testimony as to the importan[ce] of denial in determining progress in treatment[,]" pointing to "documentation in [Dr. Lorah's] report as to studies showing the limited impact denial had in terms of risk to [reoffend]." The judge considered Dr. Lorah's view that denial and minimization by offenders can serve as a "protective factor for them," unrelated to the risk of "recidivism" and found Dr. Lorah's assertions "unconvincing."

Instead, the judge accepted Dr. Harris's opinion that M.E.H.'s "inconsistent detailing" of his acts impacts his risk level in that M.E.H.'s "difficulty identifying a coherent sex offense cycle does not build a proper safety valve which would protect society, future victims, as well as himself from

engaging in sexual offense behaviors again." The judge determined that if M.E.H. deviated from the facts he admitted in pleading guilty to the predicate crimes, it went "to the cognitive distortions . . . of the sexual offenses." The judge recounted that Dr. Canataro referred to M.E.H.'s continued degradation and blame of his victims to be "cognitive distortions that continue to seep out." The judge found it significant from Dr. Canataro's testimony that, despite "years of treatment and feedback about his versions of the offenses[,] he is still unable to change . . . the distortions of thinking patterns," illustrating "his ability to distort his offending behaviors and . . . [his continued] views of women."

The judge found the evidence better supported the view that M.E.H. presented a risk of re-offense, rather than Dr. Lorah's initial assertion that M.E.H. could bypass therapy at a therapeutic community and be conditionally discharged. Indeed, the judge accepted Dr. Canataro's testimony that M.E.H.'s placement in a therapeutic community would, at that juncture, be premature because of his lack of emotional regulation and his impulsivity. She also found more persuasive the State's expert's analysis of the actuarial risk assessment tools than Dr. Lorah's assessment. And the judge found Dr. Lorah "los[t] credibility in not finding a paraphilic disorder present in M.[E.]H.," as did Dr. Harris.

As the fact-finder in a bench trial, "the weight to be given to the evidence of experts is within the competence of the [judge]," and it is within the judge's discretion to accept or reject conflicting expert opinion after carefully considering the evidence before the court.  LaBracio Fam. P'ship v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155, 165 (App. Div. 2001).  We owe our deference, not only to the judge's decision that the State's experts were more persuasive than M.E.H.'s expert, but also to her determination that they were more credible.  See In re J.W.D., 149 N.J. 108, 117 (1997).  The judge parsed the experts' testimony, considering the bases for their opinions.

As to the judge's extension of M.E.H.'s commitment, in our narrow review, In re Civil Commitment of W.X.C., 407 N.J. Super. 619, 630 (App. Div. 2009), "[w]e must give the 'utmost deference' to the . . . judge's determination of the appropriate balancing of societal interest and individual liberty," ibid. (quoting In re Commitment of J.P., 339 N.J. Super. 443, 459 (App. Div. 2001)).  We recognize "committing judges under the SVPA are specialists in the area, and we must give their expertise in the subject special deference."  In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007).

"The appropriate inquiry is to canvass the . . . expert testimony in the record and determine whether the [judge's] findings were clearly erroneous."  In

re D.C., 146 N.J. 31, 58-59 (1996).  We will modify the judge's determination to continue commitment "only where the record reveals a clear abuse of discretion."  In re Civil Commitment of J.M.B., 395 N.J. Super. 69, 90 (App. Div. 2007).

The judge's findings are amply supported by the record and her determination that the State met its burden of proof by clear and convincing evidence was not at all erroneous, much less clearly erroneous.  We discern no abuse of discretion in the judge's ruling.  Our determination in 2008 is still applicable today:  "There is no doubt that M.E.H. 'has serious difficulty controlling his . . . harmful sexual behavior such that it is highly likely that [he] will not control his . . . sexually violent behavior and will reoffend.'"  M.E.H., slip op. at 10 (App. Div. Feb. 27, 2008) (alterations in original) (quoting W.Z., 173 N.J. at 133-34).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

10

A-0683-19